Motion to dismiss appeal submitted January 14, overruled January 21,
  second motion to dismiss filed January 29, overruled February 25,
  on the merits submitted on briefs June 4, modified July 15, rehear-
  ing denied September 9, 1919.

# ROBINSON *v.* PHEGLEY.

### (177 Pac. 942; 178 Pac. 799; 182 Pac. 373.)

**Appeal and Error—Order Extending Time for Filing Transcript—Date
of Taking Effect.**

1. An order extending time for filing transcript pursuant to Section
554, subdivision 2, L. O. L., is made when it is in writing and signed
by the judge, in view of Section 534, but is not effective until deliv-
ered to the clerk.

**Appeal and Error—Order Extending Time for Filing Transcript—
"Filing."**

2. Order extending time for filing transcript *held* sufficiently filed;
"filing" not being merely the indorsement which the clerk makes, but
the fact that the instrument is placed in his custody with intent to
make it effective.

**Appeal and Error—Notice of Appeal.**

3. Under Deady & Lane Gen. Laws, Chapter 6, Section 527, as
amended by General Laws of 1899, page 227, notice of appeal may be
signed by the party appealing or his attorney.

**Appeal and Error—Notice of Appeal—Description of Decree—Suffi-
ciency.**

4. Notice of appeal *held* to sufficiently describe decree appealed
from.

**Appeal and Error—Specification of Errors—Dismissal.**

5. Though appellant's abstract did not contain an assignment of
errors, as required by Rules 11 and 12, 89 Or. 715–717 (165 Pac. viii),
*held* that as the failure to furnish specification of errors is not juris-
dictional, and as it appeared from an affidavit of appellant's attorney,
showing that the time to file an abstract was short when he came into
the case, and that through haste he omitted to file an assignment of
errors, the appeal should not be dismissed, and appellant should be
permitted to amend the abstract.

**Corporations—Mortgages—Execution and Consideration—Evidence.**

6. Mortgage of corporation, which mortgage plaintiff purchased from
defendant *held* duly executed for a valuable consideration.

**Corporations—Mortgage—Assignment—Rights of Assignee.**

7. Where plaintiff to protect her interests in a corporation purchased
a $6,000 note and mortgage from defendant upon representation that
he was owner and holder in his own right, and under agreement that
plaintiff was to pay dollar for dollar of what he had put into the prop-
erty, and defendant concealed from plaintiff that he was to have and

did receive a fee of $2,000 out of the note and mortgage for his services as trustee, *held* defendant will be required to pay over to plaintiff the $2,000, though the mortgage at time of purchase constituted a valid and subsisting lien on the property of the corporation.

**Appeal and Error—Equity Suit—Trial De Novo.**

8. The suit being in equity, it is tried *de novo* in the Supreme Court, BURNETT, J., Dissenting.

Overruled January 21, 1919.

### MOTION TO DISMISS.
(177 Pac. 942.)

*Mr. Ralph A. Coan* and *Mr. C. A. Sheppard,* for the motion.

*Mr. Wilson T. Hume, contra.*

From Multnomah: GEORGE R. BAGLEY, Judge.

In Banc.

McBRIDE, C. J.—This is a motion to dismiss an appeal. The grounds assigned are: (1st) That the transcript was not filed within the time prescribed by statute, or within any extension of that time; (2d) That the notice of appeal is signed by the appealing party and not by her attorney, and (3d) That the notice of appeal does not sufficiently describe the judgment. On the face of the transcript it appears that after perfecting her appeal plaintiff secured two orders extending the time to file the transcript. The first order granted an extension of fifty days, and before this time elapsed another order was made extending the time until November 1, 1918. It further appears from the transcript that an order further extending the time and dated October 15th was filed and entered on November 7th, the date of such filing being not within any extension theretofore granted. It is

claimed that the failure to file the order dated October 15th, before the expiration of the time granted by the previous order, deprives this court of jurisdiction.

By Section 554, subdivision 2, L. O. L., it is provided that the time may be extended by an order of the court or judge thereof, but that such order must be made within the time allowed to file the transcript. Section 534 defines an order as follows:

"Every direction of a court made or entered in writing and not included in a judgment or decree is denominated an order."

1, 2. Clearly the order is *made* when it is in writing and signed by the judge, but in our opinion it is not effective until delivered to the clerk. There is no provision of the statute requiring the entry of orders of this character in the journal and the practice in that respect varies in different districts of this state.

The appellant has filed here the affidavit of the presiding judge that he signed the order on the 15th of October, as the date indicates. There is also an affidavit of J. M. Rogers, a deputy county clerk, to the effect that the order was made and signed by the judge of the Circuit Court on October 15, 1918, and delivered by the judge to him and by him entered and recorded in the record of orders and was thereafter delivered to another deputy clerk for manual copying in the journal of the court. We think this was a sufficient filing. The order was actually in the record with the intent that it should be effective and the filing of a paper is not merely the indorsement which the clerk makes upon it, but the fact that it is placed in his custody with the intent to make it effective.

The affidavits of the judge and deputy clerk being uncontradicted, we shall treat the order as having

been properly made. They amount to an official certification of what was actually done and explain the apparent discrepancy between the date of the order and its entry on the journal.

3. The objection that the notice of appeal is signed by the party instead of the attorney is not well taken. Under the statute, as it existed prior to 1899, it was held in *Poppleton* v. *Nelson,* 10 Or. 437, that a notice signed by a party who had an attorney of record was insufficient. The statute then in force (Section 527, Deady & Lane Code) provided that "the appellant shall cause a notice to be served on the adverse party," etc. By Gen. Laws, 1899, pp. 227, 228, this section is amended so as to read, "The party desiring to appeal may cause a notice signed by himself or attorney to be served upon the adverse party," etc. There can be no question but that this amendment authorizes the party appealing to sign the notice. It was probably passed to avoid the somewhat strained construction given to the former statute in *Poppleton* v. *Nelson,* 10 Or. 437, which had already been criticised by Justice THAYER in *Shirley* v. *Burch,* 16 Or. 1 (18 Pac. 344).

4. We think the notice sufficiently describes the decree appealed from. The notice states the title of the cause; is directed to the defendant and his attorneys, and reads as follows:

"You are hereby notified that the plaintiff appeals to the Supreme Court of the State of Oregon from the decree entered in the above-entitled court and cause on the 19th day of April, 1918, and that such appeal is from the whole of said decree and each part thereof.

"(Signed) EMMA G. ROBINSON, Plaintiff."

Here it will be seen that the appeal is from a decree of the Circuit Court of Multnomah County, in a cause

in which the appellant was plaintiff and respondent was defendant, and which decree was rendered on April 19, 1918. It would be difficult to make the description more specific without including much useless detail. This court has always been averse to dismissing appeals on account of mere technical defects in the notice, where it has been evident that no one could be misled by a slight defect or omission. A notice almost identical in terms with that here discussed was held sufficient in *Fraley* v. *Hoban*, 69 Or. 180 (133 Pac. 1190, 137 Pac. 751).

The motion to dismiss the appeal is overruled.

OVERRULED.

Overruled February 25, 1919.

SECOND MOTION TO DISMISS.

(178 Pac. 799.)

ᐛ  *Mr. Ralph A. Coan* and *Mr. C. A. Sheppard,* for the motion.

*Mr. Wilson T. Hume, contra.*

PER CURIAM.—Defendant moves to dismiss the appeal for the reason that the abstract filed by appellant does not contain an assignment of errors, as required by Rules 11 and 12 of this court: 89 Or. 715–717 (165 Pac. 8). Appellant's attorney files a counter notice for leave to file an amendment to the abstract, specifying the errors relied upon, and files an affidavit showing that the time, within which to file an abstract, was short when he came into the case and that through haste he omitted to include a specification of errors therein. The failure to furnish a specification of errors is not jurisdictional, and it is plain that such

omission has not worked any disadvantage to respondent.

Under all the circumstances we think it would not be in the interests of justice to dismiss this appeal for a mere technical failure to comply with the rules. The plaintiff will be permitted to amend the abstract and the motion to dismiss will be overruled.

OVERRULED.

Submitted on briefs June 4, modified July 15, 1919.

ON THE MERITS.

(182 Pac. 373.)

In Banc.

The third amended complaint was filed on August 2, 1916, in which the plaintiff prayed for judgment against the defendant for the sum of $34,345.43, with accrued interest from June 11, 1907, "and for such other, further and different relief to which plaintiff may be entitled and which to equity may seem meet." To this complaint a demurrer was sustained by the trial court and the plaintiff appealed to this court, where the case was "reversed and remanded with directions" in an opinion by Mr. Justice McCAMANT, 84 Or. 124 (163 Pac. 1166). By that opinion it was decided that the plaintiff did not have any cause of suit against the defendant, except as to the $6,000 mortgage described in her complaint, which had been foreclosed by the decree of the Circuit Court for Josephine County.

As to that mortgage, the complaint alleges that in the year 1907 the Galice Consolidated Mines Company was an Oregon corporation and the owner of valuable

mining property in this state; that the plaintiff was then a stockholder and had an investment of more than $15,000 therein:

"That at said time the defendant represented to the plaintiff that he had certain *bona fide* and legal claims against said corporation aggregating the sum of nine thousand six hundred ($9,600.00) dollars, and that said claims represented moneys actually paid, laid out and expended by him, the said defendant, for and on behalf of said corporation, and the plaintiff relying on the truthfulness of said representations and in order to protect her interests in said corporation, agreed to purchase from the said defendant his interest in and against said corporation for and in consideration of the payment by the plaintiff to the defendant of the sums actually paid, laid out and expended by the defendant, for and on behalf of said corporation, and for which said corporation was represented by the defendant to the plaintiff to be liable to him; that defendant further required of plaintiff the performance by her of the duties imposed on defendant under the terms of a certain contract between himself and one T. K. Anderson, et al., bearing date March 16, 1907; that a true copy of said last mentioned agreement marked Exhibit 'A' is filed herewith and prayed to be read as a part hereof.

"That among the amounts which the defendant represented to the plaintiff to have been so paid, laid out and expended by him, was the sum of six thousand ($6,000.00) dollars secured by a mortgage upon the properties of said corporation; that defendant proceeded to foreclose said mortgage and to acquire and did so acquire at the sheriff's sale the legal title to the property of said corporation, thus rendering valueless except as to the corporation's equity of redemption, the stock interest of plaintiff herein.

"That thereupon on the 11th day of June, 1907, the plaintiff, relying as aforesaid upon the truthfulness of the representations of the defendant hereinbefore set forth and upon the validity and good faith of said

93 Or. —20

mortgage and the proceeding to foreclose same, paid to the defendant the sum of forty-eight hundred ($4,800.00) dollars, as the equivalent of one-half of the amount asserted by the defendant to be due him. from said corporation and assumed one-half of the burdens of defendant under the contract with Anderson referred to as Exhibit 'A' herewith and at the time of purchasing said one-half interest, plaintiff and defendant entered into an agreement, a true copy of which is hereto attached marked Exhibit 'B' and prayed to be read as a part hereof; and thereafter, on or about October 19, 1907, plaintiff paid to the defendant an additional sum of forty-eight hundred ($4,800.00) dollars, representing the remaining one-half of the burdens of defendant under the contract with Anderson referred to as Exhibit 'A' herewith, and at the time of purchasing said one-half interest, plaintiff and defendant entered into an agreement, a true copy of which is hereto attached, marked Exhibit 'C' and prayed to be read as a part hereof.

"That in truth and in fact, the said sum of six thousand ($6,000.00) dollars represented by said mortgage was not paid, laid out or expended by plaintiff (defendant) for said corporation, nor was any part thereof so advanced; that the pretended indebtedness of the corporation to the defendant in said amount was purely and wholly false and fictitious; that in truth and in fact, said mortgage had been executed by the corporation solely to secure the defendant against any liability which might arise out of his suretyship on certain undertakings of the corporation on an appeal to the Supreme Court of Oregon and that all liability on said undertakings had terminated before the transaction between plaintiff and defendant hereinbefore referred to; that said mortgage foreclosure proceedings whereby said defendant acquired the legal title to said corporate property and rendered valueless plaintiff's stock in said corporation were pursuant to and a part of the fraudulent scheme of said defendant to bring pressure to bear on plaintiff in order to protect her said investment and compel her to procure an

assignment from defendant of his alleged liens and claims against said corporation and of his interest therein as outlined in the exhibits filed herewith.

"That the plaintiff, so relying upon and believing in the truthfulness of the defendant's representations referred to, continued during the succeeding years upon said assumption, to shoulder and perform the burdens imposed by the defendant Phegley under said contract, Exhibit 'A,' and continued to incur the expenditures and make the disbursements necessary to preserve and protect the interest referred to in said contract; that nothing occurred to arouse the suspicions of the plaintiff as to the fraud so perpetrated upon her by the defendant until the present year at which time the plaintiff, in the course of investigation along other lines, came into possession of knowledge of circumstances, the further investigation of which led to the discovery of said fraud; that plaintiff promptly upon said discovery made demand upon the defendant for restitution; that some months of delay followed, during which time the matter was claimed by the defendant to be under the advisement of himself and his attorney, and that plaintiff within a reasonable time after the refusal of the defendant to restore her to the position in which she was before she was led into said agreement by the fraud of the defendant, instituted this suit."

It is further alleged that the existence and validity of the $6,000 mortgage was the material and primary consideration for the agreement of plaintiff to purchase the interest of the defendant, all of which facts were known and used by him as a means of inveigling the plaintiff into the agreement of purchase, and that she would not have entered into that had she known the mortgage did not represent an actual *bona fide* existing debt of the corporation to the defendant.

After the foreclosure, the title to the property was lost to the mining company and that corporation was dissolved in 1908.

The agreement between the plaintiff and the defendant executed on June 11, 1907, recites that the defendant does sell, assign and transfer to the plaintiff a one-half interest in his mortgage and other claims against the company, and all his rights under the foreclosure decree, by which there was to be a sale of the property on June 15, 1907, in consideration of which the plaintiff was to pay the defendant one half of the amount of his claim, amounting in all to $9,600. The agreement states that "they shall buy" and "share equally in purchasing said property"; that "whatever may be done by either of them in regard to the matters aforesaid, shall be for the mutual benefit of both of them, and that they shall be equally interested therein"; that the agreement is based upon the mutual trust of the parties and that neither of them shall dispose of any part of the property to a third party, without the written consent of the other, or without giving the other thirty days' option at the "same price at which he shall propose to sell."

Concurrent with the execution of the agreement, the plaintiff paid the defendant $1,000 and gave him a 60-day note for $3,800. On October 19, 1907, she purchased from the defendant his remaining half interest, paying therefor the further sum of $4,800.

In his answer the defendant admits his ownership of the $6,000 mortgage and the foreclosure decree rendered thereon, and that the plaintiff purchased and acquired all of his interest therein, but denies all other material allegations of the complaint. For a further and separate answer he alleges the execution of the written agreements; that he has fully performed all of their respective provisions; that by reason thereof the plaintiff entered upon and took possession of the property and should now be estopped from claiming that

the contracts were otherwise than as alleged and set forth in the complaint; that the plaintiff was a stockholder in the company; that she acquired and has never been disturbed in her possession of the property; that she has enjoyed such undisturbed possession for a period of nine years, during all of which time she made no effort to determine the validity of the mortgage, and that she is now and ought to be estopped from attacking the same in this suit.

In her reply the plaintiff denies all new matter in the answer. After the testimony was taken the trial court rendered a decree dismissing the complaint, and the plaintiff appeals.                    MODIFIED.

For appellant there was a brief submitted by *Mr. Wilson T. Hume.*

For respondent there was a brief prepared and submitted by *Mr. Ralph A. Coan* and *Mr. C. A. Sheppard.*

JOHNS, J.—The law of this case was settled by Mr. Justice McCAMANT's opinion. Hence the validity of the $6,000 mortgage and the relations existing between the plaintiff in regard to the mortgage are the only questions involved and they are questions of fact. The case was tried by the plaintiff in the lower court upon the theory that the $6,000 mortgage was fictitious and void.

The defendant was not a stockholder in the mining company and apparently had no interest in it, yet for some reason not disclosed by the record he voluntarily offered to purchase the $2,000 mortgage from the Grants Pass Banking & Trust Company, which was a prior lien upon the property, and he testified that he

told Dr. Cable, "If they have to have the cash I'll buy the note, if it is agreeable to you; I will write them to that effect," and the latter replied, "All right, go ahead and take it up." The defendant further testified that he then wrote the bank and within a few days the assignment was forwarded to a Portland bank. He says, "I paid them the $2,000 plus the interest due on it and took it up," paying the bank the full amount of the $2,000 mortgage with all accrued interest to the date of purchase.

5. The testimony that the $6,000 mortgage was duly executed for a valuable consideration is clear and convincing. It appears that the execution of that note and mortgage was authorized at a meeting of the board of directors of the corporation called for that purpose, at which Dr. Cable, president, Milton Weidler, secretary, and all the other directors were present and agreed to its execution. At that meeting it was represented that Dr. Cable had advanced money to pay the bills of the company amounting to $4,000; that there was due Mr. Cousins for his salary and money advanced by him $2,700; that the company owed attorneys' fees and miscellaneous bills to the amount of $1,250, making a total of about $8,000, and that there was to be returned from the bond company $2,000, leaving a net amount of $6,000 due Cousins and Cable, all of which matters were fully explained and approved at the meeting of the directors.

It also appears that neither Cousins nor Cable desired to have the mortgage taken in his own name, and they suggested that it be executed in the name of the defendant as trustee for them according to their respective interests, and it was executed in the name of the defendant, while in fact the latter was the apparent owner and holder of the $6,000 note and mort-

gage and held himself out to the plaintiff as such owner at the time of the execution of the contract between them, yet he held such note and mortgage as trustee only for Cousins and Cable and did not have any personal claim against the mining company for the amount represented thereby.

The purpose of the plaintiff, and the opinion of Mr. Justice McCAMANT so decides, was to acquire all the existing liens against the corporation, to protect her investment of more than $15,000 in the stock of the corporation, and if the liens were valid it could not make any difference to her personally, who was the owner or holder of such claims.

But there is another element which as between the plaintiff and the defendant enters into and is a part of the consideration and purchase price of the $6,000 note and mortgage.  Phegley testified:

"Q. What was the amount of fees upon which you had agreed with these gentlemen that you were to receive for your services?

"A. They were to give me one third of the six thousand dollars.

"Q. Were you to get any part of the two thousand dollars?

"A. I owned the two thousand dollars; all of that.

"Q. The other two thousand?

"A. The trustee; no.

"Q. You were only to get one third of the six thousand dollars?

"A. That is all."

After stating that the defendant's wife and her sister and two of her brothers had been her pupils and that "they were a lovely family of boys and girls that I thought a great deal of; and so when I found she was married to Mr. Phegley I at once had implicit con-

fidence in Mr. Phegley that I could rely upon him," the plaintiff testified:

"I talked over the matter with him and said I wanted to save my possession, and it resulted in me buying out the half of his interest for exactly dollar for dollar of what he himself had put into the property. * * At any rate I signed the contract for one half, for exactly one half of what he put in, cash advanced, nothing else.

"Q. Will you state whether or not there was to be any profit or loss on his part in the transaction?

"A. Not a cent. * *.

"A. He gave me to understand that he had put in dollar for dollar for that in the property, money advanced by him in the property and he was actually entitled to it. * * He said he had put that much money into the property; every dollar of it. * *

"Q. Will you state whether or not you were suspicious of the statements made by Mr. Phegley at the time of this transaction?

"A. I had no suspicions whatever.

"Q. Will you state to the court whether or not this consideration would have been paid or contract entered into by you at the time had you known that this six thousand dollar mortgage was a mortgage given to secure the president and manager of that corporation for alleged past indebtedness due them?

"A. I never would; I wouldn't have entered into it."

Regarding her contract with the defendant, she further testified:

"I was to take over one half of Mr. Phegley's interest, dollar for dollar, for what he had put in; I would make good to him for one half and not a dollar more.

"Q. Didn't you and Mr. Phegley agree before this meeting you were to buy half of this nine thousand six hundred dollars?

"A. No, sir; it was half of what he put into the property.

"Q. You had not agreed with Mr. Phegley how much you were to pay for this property?

"A. I repeated that I agreed, over and over, I agreed to pay him dollar for dollar for what he put into it."

Although the defendant denies that he ever represented to the plaintiff that he had "paid out or expended on this property that $6,000 claim," he does not dispute her testimony that she was "buying out the one half of his interest for exactly dollar for dollar, all of what he himself had put into the property," and the fact remains that the original contract between them, dated June 11, 1907, was prepared and executed on the representation that the defendant was the owner and holder of the $6,000 note and mortgage in his own right and name, and the plaintiff never knew or was advised that the defendant held the mortgage as trustee for Cousins and Cable until he testified as a witness in this case.

Referring to the $6,000 note and mortgage, he testified that he was to receive one third of that amount, or $2,000, for his services as trustee for Cousins and Cable, who were the real owners, and that important fact was concealed from the plaintiff, who paid the full face value of both mortgages and accrued interest and other moneys advanced, making a total of $9,600.

While the record shows that the full amount of the $6,000 mortgage was a just and valid debt and lien against the corporation, the fact that the defendant was to receive $2,000 out of the principal for his services as trustee of that mortgage is sufficient to arouse at least a suspicion of the good faith of the whole

transaction. Legitimate business is not done on any such basis.

It further appears that when the plaintiff paid the agreed purchase price to the defendant the latter took the trustee money of Cousins and Cable, which he received from her, and purchased stock for them in another mining corporation of which he was the moving spirit.

6. On the record, we are of the opinion that the defendant held the $6,000 note and mortgage as trustee for the use and benefit of Cousins and Cable only; that they were executed for a valuable consideration and constituted a valid and subsisting lien on the property of the mining company at the time of purchase by the plaintiff. The agreement by which the plaintiff purchased the $6,000 note and mortgage included and carried with it the agreement that she was to pay "dollar for dollar all of what he himself had put into the property." That was one of the considerations for, and which entered into, the purchase. It is very apparent that the defendant misled and deceived the plaintiff and concealed from her the fact that he was to have and did receive a fee of $2,000 out of the $6,000 note and mortgage, for his services as trustee for Cousins and Cable, and that the plaintiff relied upon the statements of the defendant as to the amount of his investment. We hold that in equity and good conscience the defendant should be required to pay over to the plaintiff the $2,000.

7, 8. This is a suit in equity and is tried *de novo* in this court. The decree of the Circuit Court will be modified and one entered here in favor of the plaintiff against the defendant for $2,000, with costs in this and the Circuit Court.          MODIFIED.

BURNETT, J. (Dissenting).—This suit was before this court on an appeal by the plaintiff from a decree of the Circuit Court sustaining a demurrer to the third amended complaint and dismissing the suit. In an opinion reported in 84 Or. 124 (163 Pac. 1166), the decree of the Circuit Court was reversed with instructions to overrule the demurrer. This having been done, the defendant answered, the plaintiff replied and the court heard the testimony of the parties and entered a decree dismissing the plaintiff's suit with costs. She again appealed.

In addition to the statement in the former opinion, it is proper to say that we glean from the pleadings and evidence that the Galice Consolidated Mines Company, hereinafter called the company for the sake of brevity, was an Oregon corporation owning mining property in Southern Oregon, and the plaintiff had invested in its stock a sum of money in excess of $15,000. It was indebted to a banking concern at Grants Pass for borrowed money in the sum of $2,000 and interest, for which the company had given its note and mortgage upon the property, and this constituted the first lien on its holding. The defendant Phegley had purchased this note and mortgage, paying therefor its face and the accrued interest. This appears from undisputed testimony.

One Anderson and his associates had recovered two judgments against the company, one for $2,500 and another for $2,600, which constituted liens second only to the $2,000 mortgage already mentioned. The defendant had a $6,000 mortgage on the property, subsequent and inferior to the judgment liens already mentioned. In a suit to foreclose, making the judgment lienholders defendants, he had obtained a decree fore-

closing his mortgages, had issued execution and the day of sale was appointed for June 15, 1907. About this time, the plaintiff, in order to obtain control of the property with a view of protecting the investment she had already made, approached the defendant, whom she met for the first time according to her testimony, and proposed to purchase his claims against the company. She testifies that she was told of the mortgage by a broker with whom she had had some dealings, and in consequence of this information she felt it necessary to act at once in order to obtain control of the property. Previous to this, Phegley had entered into a contract with Anderson, the substance of which was that the property should be sold either by virtue of the Anderson judgments or foreclosure of the mortgages held by Phegley, and should be bought in by one or the other as they might choose, and the property pooled with mining ground held by Anderson and his associates, the assessment work kept up so as to maintain title, and finally all the properties should be sold together for the minimum price of $26,000, of which Anderson and associates should receive $16,000 and Phegley $10,000, any excess over the minimum upset price to be divided equally between Phegley on the one hand and Anderson on the other. Anderson was appointed by the pooling agreement to represent all parties in the supervision of the necessary assessment work and maintenance of the property and was to receive $40 per month for his services.

As stated, Phegley had foreclosed his mortgages and obtained a decree and order of sale, at which juncture the plaintiff opened negotiations with him for the purchase. As a result of these negotiations she had her attorney prepare for her what is known as exhibit "B," attached to her complaint, it being a

contract between the plaintiff as party of the first part and the defendant here as party of the second part, whereby under date of June 11, 1907, they agreed as follows:

"That in consideration of the promises of said party of the first part hereinafter set forth, the said party of the second part does hereby sell, assign, transfer and set over unto said party of the first part a half interest in and to the mortgage and other claims belonging to him against the Galice Consolidated Mining Company and of his rights under a certain decree entered in his favor in the circuit court of Oregon for Josephine County in a case where he is plaintiff and the Galice Consolidated Mining Company and others were defendants, under which decree there is to be a sale of the property of said Galice Consolidated Mining Company on June 15, 1907.

"In consideration of the foregoing, the said party of the first part does hereby agree to pay to said party of the second part one half of the amount of his claim against said company at the present time, including one half the money expended by him in the care of said property, amounting in all to ninety-six hundred dollars."

The remainder of the agreement recites in substance that they should share equally in purchasing the property at the coming sale and neither should dispose of the undivided interest thus obtained, without giving the other an option of thirty days to purchase the same. The plaintiff also bound herself by exhibit "B" to the performance of half of Phegley's obligation under the pooling agreement.

Afterwards, on October 19, 1907, they entered into the agreement called exhibit "C," attached to the complaint, narrating the foreclosure of the mortgage and the judgment liens of Anderson; that Phegley had purchased the property of the company by virtue

of the sale and confirmation thereof and the consequent sheriff's deed, and that he had assigned to plaintiff a half interest, and later the remaining half, and declaring finally:

"Now, therefore, this is to certify that the said Grant Phegley now holds the naked legal title to the properties so purchased by him at such sale, in trust for the said Anderson, Williamson and Phillips of the one part and said Emma G. Robinson of the other part, whatever the said several interests may be, and without any beneficial interest of his own in and to said property or any part thereof."

The complaint here was amended by interlineations on its return to the Circuit Court at the time of trial, so as to attack not only the mortgage for $6,000 but also the one for $2,000, on the ground that the latter encumbrance represented a false and fraudulent claim and that in fact no part thereof was due and owing to Phegley from the corporation at any time. The complaint is to the effect that the existence and validity of the $6,000 indebtedness and the liability of the corporation for the further sum of $2,000 were material and prime considerations on the part of the plaintiff, inducing her to "purchase the interests of the defendant, in that the same constituted, if the averments of the defendant were true, a valid and existing lien upon and thereafter a title to the corporate property, the control of which lien and title was necessary for the protection of the plaintiff's interest in said corporation." She says in effect that on the contrary neither of these claims had any validity and neither of them represented any actual indebtedness against the corporation. She claims that the foreclosures were collusive. She says she has no plain, speedy or adequate remedy at law, offers to return to the de-

fendant all of the choses in action, property and rights
transferred to her by the agreements, exhibits "B"
and "C," and prays that the agreements be canceled
and that she have judgment against the defendant for
$34,345.43, which presumably is the amount of the
various sums of money she has expended in the ven-
ture, although it cannot be computed at that figure
from the abstract before us.

The answer admits the making of the agreements,
traverses all allegations of fraud and misrepresenta-
tion and denies the charge that the mortgages men-
tioned were not valid claims against the company.
Affirmatively, the defendant avows making the con-
tracts alluded to and that by virtue thereof the plain-
tiff entered into possession of the property and has
retained the same and the beneficial use thereof up to
the present time. Other questions are raised by the
affirmative matter in the answer which are deemed
unnecessary for consideration.

The crux of the controversy is whether or not the
two mortgages in question for $2,000 of money origi-
nally borrowed from the bank, and the $6,000 in-
cluded in the mortgage given directly to the defendant,
were valid claims against the company. The plaintiff
gave no evidence whatever to support her averment
of the invalidity of the $2,000 mortgage. On the con-
trary, the defendant testifies that the bank was press-
ing the company for its money which it had loaned
and that at that time he bought the note and mortgage
from the banking concern for its full face value, in-
cluding the accrued interest. There is nothing what-
ever in the testimony to dispute this assertion of the
defendant and hence the attack on the plaintiff must
fail as to the $2,000 mortgage. She says in her com-
plaint concerning the $6,000 mortgage that it was

given to indemnify the defendant against liability which might befall him by virtue of an undertaking which he had signed for the company on an appeal from the judgments rendered against it in favor of Anderson, but that the appeal having been dismissed, that mortgage had served its purpose and thereafter was of no effect, notwithstanding which the defendant had sold it to her, together with the decree for its foreclosure. There is no evidence whatever in the record tending in the least to sustain the plaintiff's allegation in this respect, although it was denied by the defendant. On the contrary, the latter proved by the testimony of the secretary of the corporation that the company was indebted to its president for money advanced for the expenses of the corporation, and to its then secretary for his salary, which were actual, *bona fide* claims, and that there were other demands against the company, swelling the total to about $8,000; that the sum of $2,000 returned from a surety company which had taken that deposit as indemnity against liability, was deducted from the total liability of $8,000, leaving a balance of $6,000 of actual indebtedness of the company, which was embodied in the mortgage for that amount of money. The defendant explains that it was taken in his name at the instance of the president and the secretary of the company, neither of whom desired to have precedence over the other in his demand against the company, hence at their request he took and held it in trust for them as their interest might appear. He testified as the first witness for the plaintiff, who thereby having called him to testify, vouched for his credibility. He says that for his services he was to have as his compensation one third of the proceeds of the mortgage. He explains that when the property was sold on foreclosure he invested the

proceeds of the $6,000 mortgage in stock in another mining company at the direction of the beneficiaries.

It is well to attend to the terms of the agreement which the plaintiff had her attorney prepare. It is said there:

"That in consideration of the promises of said party of the first part [the plaintiff here] hereinafter set forth, the said party of the second part does hereby sell, assign, transfer and set over unto said party of the first part a half interest in and to the mortgage and other claims belonging to him against the Galice Consolidated Mining Company and of his rights under a certain decree entered in his favor, * * under which decree there is to be a sale of the property of said * * company on June 15, 1907."

On her part, she promised to pay not only one half the amount of his claim against the company thus recited and evidenced, but also one half of the money expended by him in care of the property, amounting in all to $9,600. She agreed to do those two things: First, to take up half the decree, and second, reimburse the defendant for half he had otherwise expended.

In a sense, these are mutual contractual considerations. They are the language of the plaintiff herself, speaking through her own attorney who prepared the contract. She knew what she was signing and she knew what she was contracting to do and what the defendant agreed to perform. As said in *Sutherlin* v. *Bloomer,* 50 Or. 398, 407 (93 Pac. 135, 139):

"The consideration specified in the written contract consists of certain acts to be performed, and the authorities are practically unanimous in holding that, where the statement in the written instrument as to the consideration is of a contractual nature, as where the consideration consists of a specific and direct

promise by one of the parties to perform certain acts, it cannot be changed or modified by parol or extrinsic evidence. A party has a right to make the consideration of his agreement of the essence of the contract, and, when this is done, the consideration for the contract, with reference to its conclusiveness, must stand on the same footing as its other provisions, and accordingly cannot be affected by the introduction of parol or extrinsic evidence: (Citing authorities.)''

The plaintiff's object, stated by herself, was to obtain control of the property through the sale of the same under the decree of foreclosure, which sale was then near at hand. The decree was a valid one. With the purpose she had in view it could make no difference to her whether the $6,000 mortgage was held by Phegley as trustee or in his own right. Such a representation, even if untrue, would be immaterial under the circumstances and would not be any basis upon which to charge fraud. The undisputed testimony shows that it was given by order of the directors upon a thorough investigation of the claim upon which it was based, which was for money advanced to the company and for salary to its secretary. Neither can it make any difference to her what disposition was to be made of the proceeds of the sale under the decree, or what compensation the beneficiaries for whom the mortgage was held should give to the defendant for his services. Taking for true all that Phegley said about holding the $6,000 mortgage for the benefit of those to whom the money was due, yet the decree was valid because Section 29, L. O. L., says:

''An executor or administrator, a trustee of an express trust, or a person expressly authorized by statute, may sue without joining with him the person for whose benefit the action is prosecuted. A person with whom or in whose name a contract is made for

the benefit of another is a trustee of an express trust within the meaning of this section.''

Although Phegley held this mortgage in trust for other parties to whom the indebtedness was actually due, and although they were to compensate him for his services, all of which is undisputed, the claim upon which the mortgage was based, the mortgage itself and the decree entered in pursuance thereof constituted a valid claim against the company and a lien upon its property. Its ownership gave her the control she desired. The plaintiff herself says that she sought Phegley, not he, her. She said she had never met him before and had never even known his name until she ''learned he had foreclosed this mortgage.'' She further says:

''So then I talked over the matter with him and said I wanted to save my possession, and it resulted in me buying out the half of his interest for exactly dollar for dollar of what he himself had put into the property.

''Q. How was the amount arrived at?

''A. We counted up the first mortgage and interest on that and the second mortgage and interest on that and what he claimed he had spent on the property, and attorney's fees and expenses in going over the property and different times down to Grants Pass and everything dollar for dollar of what he had expended up to that time on the property and I was to pay that; it amounted at that time to nine thousand, six hundred and three dollars, and when I took over the one half I paid him cash difference, the one dollar and a half so as to make it a round number.''

On cross-examination she testified as follows:

''Q. Just when you made the deal, just what did Mr. Phegley say to you regarding the claim he had?

''A. I could not repeat his words eleven years after. I am under oath. I know the impression I got from him.

"Q. I don't care about the impression.

"A. I could not repeat his words. He said he had advanced so much. He used words so that I fully understood that he had advanced that money,—put that much money right over into the property.

"Q. Did he use the word 'advanced'?

"A. I could not swear to that.

"Q. Did he use the word 'pay'?

"A. I could not swear to the exact words he used.

"Q. All you are testifying to is the impression that he left with you?

"A. I am testifying to the exact understanding his words gave me, but whether he used this word or that word I couldn't say. I know I talked with him that I wanted to save my stock in that property and must do so.

"Q. And you wanted to get these mortgages so you could save it?

"A. Yes, sir; that was the only way open to me, was to buy a half interest with him."

The ground of her attack upon the $6,000 mortgage, as stated before, is to the effect that it was given solely to secure the defendant against any liability which might arise out of his suretyship on the appeal undertakings which he had signed for the company in appeals which had long since terminated, thus destroying any possibility of his being held upon the undertakings. But, as stated, she produced no syllable of testimony on that subject. The validity of the mortgage is beyond dispute and it was an actual, *bona fide* indebtedness of the company. It is a mere quibble to say that because Phegley held it as trustee, claiming also an interest in the proceeds as compensation, the claim was not a valid one for which the property was liable. Phegley was entitled to collect every cent of the claim, because he had a valid decree for it which the plaintiff has utterly failed to impeach in any sense of the word.

She has sought by this suit, not to recover damages for the fraud she claims to have been practiced upon her, but to rescind the contract on account of the alleged deceit and to secure a restoration to her of all that she parted with in consequence of having made the agreement. She might have elected to sue for damages. She did not, but chose rather to sue in equity for a rescission. But, whichever horn of the dilemma she adopts, and whether this is to be treated as a suit to rescind or as an action for damages, she has utterly failed to prove any of the allegations of her complaint respecting the fraud charged.

While testifying as a witness for the plaintiff, after stating that he was a trustee for parties who had advanced the $6,000 to pay the debt of the company, Phegley was asked this question by her counsel:

"Was that fact communicated by you to Miss Robinson at the time of your negotiations with her, as a result of which the contract admitted in the pleadings was executed?"

—and replied:

"I may have told Miss Robinson that I was holding the $6,000 mortgage for other parties, but the $2,000 mortgage I owned myself."

In brief, under the circumstances disclosed by the evidence it is immaterial whether Phegley held this $6,000 mortgage and the decree in pursuance thereof; entirely in his own right or wholly in the right of another or partly in his own right and partly in that of others. It was still a valid lien upon the property which the plaintiff sought to obtain so as to control the holdings of the company. Having prepared the agreement herself by her own attorney after a full explanation and computation of the several amounts due, she certainly cannot claim that she was defrauded.

She has wholly failed to establish a solitary controverted allegation of her complaint. She may have paid too dearly for her stock in the first instance, but she did not buy that from Phegley, nor was he known to her at that time. The corporation may have suffered in its litigation resulting in the two judgments against it, but Phegley is not shown to have influenced that matter. Moreover, no question is raised about them in this suit. The essence of the present contention is that she insists the mortgage was fraudulent, whereas it is plainly demonstrated that it was a just and valid claim against the concern. In the present juncture she has no cause of complaint, for she has utterly failed to prove her allegations. Very likely she made an unprofitable investment like many another, possessed by a craving for sudden wealth, who has put money into mining ventures without experience in the business or knowledge of the property; but that is no reason why we should amerce Phegley for her benefit. The decree rendered by the judge who heard the testimony and saw the witnesses should be affirmed.　　　　Modified. Rehearing Denied.