Motion to dismiss appeal submitted at Pendleton May 5, denied June 24, argued on the merits at Pendleton October 27, modified and affirmed December 16, 1919.

# FIRST NAT. BANK OF UNION *v.* WEGENER. (HALL, INTERVENER.)

# WRIGHT *v.* WEGENER. (LA GRANDE NAT. BANK, INTERVENER.)

(181 Pac. 990; 186 Pac. 41.)

**Appeal and Error—Notice of Appeal—Sufficiency.**

1. Where two cases were virtually, if not formally, consolidated for trial, a single notice of appeal, describing both decrees, *held* a sufficient notice for both cases.

**Appeal and Error—Notice of Appeal—Service.**

2. Under Section 550, L. O. L., providing that notice of appeal may be served on adverse party or his attorney, and Section 540, authorizing service by mail where person to be served resides in a different place, a notice of appeal may be served by mail on attorney residing in another county, though parties themselves reside in same place.

## ON THE MERITS.

**Chattel Mortgages—Right of Possession in Mortgagor Until Breach of Conditions.**

3. Under a chattel mortgage the right of possession remains in mortgagor until there is a breach of the conditions after which the mortgagee has the qualified title giving him possession.

**Chattel Mortgages—Bill of Sale in Substance Chattel Mortgage.**

4. An instrument in form of bill of sale, providing that upon compliance with certain conditions by seller the sale should become null and void, *held*, in substance, a chattel mortgage.

**Chattel Mortgages—Valid as Between Mortgagor and Mortgagee Though not Recorded.**

5. A chattel mortgage is valid as between the parties, though not of record.

**Bankruptcy—Trustee as Against Chattel Mortgagee Under Unfiled Mortgage Stands in Position of Attaching Creditor.**

6. Under Bankruptcy Act as amended in 1910 (U. S. Comp. Stats., § 9631), a trustee in bankruptcy, as against the rights of a chattel mortgagee under an unfiled chattel mortgage, stands in the position of an attaching creditor, and his rights are determined as of the date the petition in bankruptcy was filed.

**Bankruptcy—Chattel Mortgage, Recorded as Bill of Sale Against Trustee in Bankruptcy, Valid Pending Foreclosure.**

7. Where instrument in form of bill of sale, but in substance a chattel mortgage, was filed and recorded as bill of sale at the time of

the filing of bankruptcy proceedings against mortgagor, and mortgagee at time thereof had possession of the property covered by the mortgage, and action was then pending by mortgagee to foreclose the mortgage, the mortgage lien was good as against trustee in bankruptcy, though the instrument was recorded as a bill of sale instead of as a chattel mortgage.

### Bankruptcy—Notice to Trustee in Bankruptcy of Chattel Mortgage on Bankrupt's Property Sufficient.

8. Where at the time of the filing of bankruptcy proceedings against mortgagor, an action to foreclose labor liens against the lumber covered by the mortgage was pending, wherein an affidavit had been filed referring to chattel mortgage on the property, and where the bankrupt's petition referred to such mortgage, the trustee in bankruptcy upon adjudication of bankruptcy had legal notice of such mortgage, though it was not of record.

### Chattel Mortgages—No Attorney's Fees Allowed on Foreclosure.

9. In foreclosing chattel mortgage no attorney's fees should have been allowed, where there was no provision for payment thereof in either note or mortgage.

### Logs and Logging—Right to Laborers' Liens is Statutory.

10. The right to a laborer's lien on lumber is statutory, and in the absence of a specific law such a right would not exist.

### Logs and Logging—Statute Giving Labor Lien Liberally Construed.

11. Section 7462, L. O. L., giving lien for labor performed in the manufacture of lumber, is remedial, and should be liberally construed in favor of the lien.

### Logs and Logging—Laborers' Lien Lost by Removal of Lumber.

12. Under Section 7462, L. O. L., giving lien for services performed in the manufacture of lumber while the same remains at the yard wherein manufactured, laborers had no lien upon lumber which had been hauled 12 miles from the yard wherein it was manufactured, in view of Sections 7464–7467.

### Logs and Logging—Liens for Cutting Logs and Manufacturing Lumber Distinct.

13. Section 7461, L. O. L., giving laborer lien for labor in the cutting of logs, and Section 7462, providing for laborers' lien for labor performed in the manufacture of lumber, though parts of the same act are separate and distinct from each other; the former being intended for security to the logger and the latter to the operators in the mill.

### Logs and Logging—Lien Statement must Specify Labor Cutting Logs and Manufacturing Lumber.

14. Even if laborer could make and enforce a joint or dual lien for services in cutting logs under Section 7461, L. O. L., and in manufacturing lumber under Section 7462, he would be required to specify in his statement the amount and value of his labor for cutting logs, and the amount and value thereof in manufacturing lumber.

**Logs and Logging—Lien for Cutting Logs Covers Lumber Manufactured Therefrom.**

15. Under Section 7461, L. O. L., a logger has a lien, not only upon the logs cut, but upon the lumber manufactured therefrom, so long as it can be followed and identified.

**Logs and Logging—Enforcement of Lien Notwithstanding Surplusage in Lien Statement.**

16. Where the laborers were paid in full at the time of the removal of sawmill to a new site, the lien for labor will be enforced as to the lumber at the new site, though the claim was for a lien on all of the lumber, including that on the old site.

**Logs and Logging—Attorney's Fee Granted on Foreclosure of Lien Reasonable.**

17. Under the evidence, *held*, that $250 is a reasonable attorney's fee for foreclosing of 14 laborers' liens on lumber.

Bean, J., dissenting in part.

From Union: John W. Knowles, Judge.

In Banc.

The foregoing causes arise out of the insolvency of the White Pine Lumber Company, a partnership engaged in the lumbering business in Union County, Oregon. The Lumber Company, evidently being in straightened circumstances in the conduct of its business, secured a loan from the respondent, First National Bank of Union, Oregon, and gave a promissory note and a chattel mortgage upon certain of its lumber product to secure the payment of the note. It also secured a like loan from the La Grande National Bank of La Grande, Oregon, and gave another mortgage upon certain other lumber not covered by the mortgage to the Union Bank.

The appellant, P. C. Wright, is the holder of the lien claim of a large number of the employees of the Lumber Company, and as such claims loggers' and lumbermen's lien upon the lumber covered by the mortgages of each of the banks. The appellant Hall is the trustee in bankruptcy of the lumber company, and

as such trustee claims possession and the right to administer on all of the property in dispute.

The respondent, First National Bank of Union, commenced a suit against the Lumber Company to foreclose its mortgage and made Wright, as representing the lien claimants, a party defendant. Afterwards, Wright commenced a suit to foreclose his loggers' and lumbermen's liens and made the First National Bank of Union a party defendant. It was stipulated that the complaint in this case should stand as an answer to the complaint of the First National Bank of Union. Afterwards the La Grande National Bank intervened and asked for the foreclosure of its mortgage upon the lumber covered thereby.

The appellant Hall also intervened as a defendant and, as trustee in bankruptcy, claimed possession of all the property. By stipulation of the parties and an order of the court based thereon the cases were tried together upon the same evidence but separate decrees were entered.

In the Wright case the court found against the plaintiffs and in favor of the La Grande National Bank, decreeing the foreclosure of its mortgage upon the lumber covered thereby, and that the balance of the same, if there was any, should be turned over to the defendant, Geo. F. Hall, as trustee in bankruptcy. In the case of the First National Bank of Union, the court also found against the lien claimants and in favor of the bank, and decreed the foreclosure of its mortgage upon the lumber covered by it. Wright, the plaintiff in one case and defendant in the other, is attempting to appeal from both decrees; and the defendant Hall, as trustee in bankruptcy, has also filed a similar notice of appeal. This case comes up

now solely upon motions to dismiss the different appeals.

The appellant Wright served a single notice of appeal, in which he appeals severally from each of the decrees entered in the two suits, describing each of them fully and separately in the notice. He served the notice of appeal on the intervening defendant Hall, by mailing a copy of the same to John L. Rand, his attorney in Baker City. It is claimed that Wright's notice of appeal is fatally defective because there was only one notice covering both decrees; and also because, as is claimed, a notice of appeal cannot be served by mail where the *parties* reside in the same place, even if the attorneys for one of them reside in another county.

The notice of appeal filed by Hall is also a double notice, and the first ground of the motion as to the Wright notice applies equally to that of Hall.

Motion Denied.

*Messrs. Crawford & Eakin, Messrs. Cochran & Eberhard* and *Mr. B. F. Wilson,* for the motion.

*Mr. John L. Rand, Mr. J. H. Nichols, Mr. R. J. Green* and *Mr. H. E. Dixon, contra.*

BENNETT, J.—We are of the opinion that the motion to dismiss in the Wright case is not well taken. There seems to have been a virtual, if not a formal, consolidation of the cases for trial.

1. It is very plain from the notice that Wright intends to appeal and does appeal from both decrees; and indeed each decree is separately and fully described. It is impossible that the adverse party should have been in any way misled. Perhaps it might have been more appropriate to have served an

entirely distinct and separate notice in each case, but we cannot say under the circumstances and conditions of the record that the notice was fatally defective as to either one. Certainly it would not be defective as to both, and it would be impossible to distinguish and say that it would be defective in one and not in the other.

It is urged that the effect of this duplicate appeal would be to save a filing fee in one case or the other. Whether or not this is true, we do not think it would justify us in dismissing an appeal where the notice sufficiently describes each of the decrees, and fully notifies the adverse parties that it is the intention to appeal from each of them.

2. As to the service by mail, we are of the opinion that that also is sufficient. Section 550, L. O. L., as amended, provides that the notice of appeal shall be served upon the adverse party, "or upon his or their attorney *at any place in the state.*" Section 540, L. O. L., in regard to service by mail, provides:

"Service by mail may be made when the *person* for whom the service is made, and the *person* upon whom it is to be made, resides in different places."

Under these sections the appellant Wright had the option to serve his notice of appeal either upon the party individually, or upon his attorney, at any place in the state; and having selected that option in favor of the attorney, such attorney became the "person" who was being served and he living at a different place, to wit: the town of Baker, the service upon him could be properly made by mail. This seems the natural construction of the language, but besides this, it is the usual and we think the appropriate practice, where there is an attorney of record to serve the notice of appeal upon him, even although such attor-

ney does reside out of the county. This being a proper and usual thing to do, the service can unquestionably be made by mail.

What is said above in regard to the Wright appeal, also disposes of the motion to dismiss the appeal of the intervener, Hall. The double notice of appeal in his case was somewhat more general than in the Wright case, but we think it was sufficient under the holding in *Robinson* v. *Phegley,* 93 Or. 299 (177 Pac. 942, 178 Pac. 799, 182 Pac. 373); *Fraley* v. *Hoban,* 69 Or. 180 (133 Pac. 1190, 137 Pac. 751), and *Tucker* v. *Nuding,* 92 Or. 319 (180 Pac. 903).

The motion to dismiss the appeal in both cases is denied.                                              DENIED.

---

Modified and affirmed December 16, 1919.

ON THE MERITS.

(186 Pac. 41.)

In Banc.

This case came before the court on a motion to dismiss the appeal, which was overruled: 181 Pac. 990.
                                  MODIFIED AND AFFIRMED.

For appellant there was a brief with oral arguments by *Mr. R. J. Green* and *Mr. H. E. Dixon.*

For respondent there was a brief over the names of *Messrs. Crawford & Eakin* and *Mr. B. F. Wilson,* with an oral argument by *Mr. T. H. Crawford.*

For intervener, George F. Hall, there was a brief over the names of *Mr. John L. Rand* and *Mr. George H. Nichols,* with an oral argument by *Mr. John L. Rand.*

For defendant, La Grande National Bank, there was a brief submitted by *Messrs. Crawford & Eakin.*

JOHNS, J.—On June 26, 1918, the First National Bank of Union filed its complaint against C. F. Wegener, L. E. McCarthy and W. W. Markle, partners under the firm name of Western White Pine Lumber Company; A. M. Stonedahl and M. F. Davis, partners as Stonedahl & Davis; P. C. Wright, and later George F. Hall, trustee, as defendants, in which it is alleged that on December 6, 1917, the plaintiff loaned to the defendant company $1,575, for which the latter then executed its note to the bank, payable six months after date; that on December 7, 1917, the plaintiff loaned to the defendant company $1,550, taking a note therefor; and that on the latter date the company executed and delivered to the plaintiff a certain bill of sale of 304,500 feet of lumber, of which 31,000 feet was then piled on the yards of the company at what is known as the Haggerty site in Union County, to secure the payment of these promissory notes, which instrument was duly filed in the office of the county clerk of Union County and entered in Book C, at page 172, Record of Bills of Sale. It is next alleged that on February 9, 1918, the plaintiff made a further loan of $1,100 to the defendant company, for which it took the company's demand note; that on April 8, 1918, the defendant company executed to the Union Bank another note for $1,800 payable six months after date, and that on the same date it delivered to the Union Bank its certain bill of sale of 265,000 feet of lumber on the Haggerty site, which was duly filed and recorded as a bill of sale on April 9, 1918, in Book C, page 185, Record of Bills of Sale, and which was intended to secure the payment of the two promissory notes last above described. It is next alleged that on May 7, 1918, as evidence of a loan then

made, the defendant company executed to the plaintiff its certain promissory note for $5,000, payable in six months, and on that date, to secure the payment of the note, executed another bill of sale of the 265,000 feet of lumber on the Haggerty site, that being the same lumber for which it had given a bill of sale on April 8, 1918, together with 192,000 feet of lumber then in the millyards at the same place, which instrument was entered in Book C, page 187, Record of Bills of Sale. The plaintiff claims that all of the lumber covered by the three bills of sale, amounting to 761,000 feet, was hauled from the millyards where manufactured and is now piled on the yards of the defendant company at Union; that between June 1 and 17, 1918, for the hauling and piling of the lumber and paying insurance thereon the plaintiff expended, at the instance and request of the defendant company, $1,886.76; and that further to secure the payment of the said notes and advances the company, on June 3, 1918, delivered to the plaintiff the actual possession of all of the lumber covered by said bills of sale, and that since that date the plaintiff has been and now is in the exclusive possession of all of the said lumber as security for the payment of the several sums of money mentioned.

The plaintiff prays for the usual decree of foreclosure of the bills of sale as chattel mortgages, the sale of the lumber and the application of the proceeds to its claims, and that such claims be declared superior in right and time to all other demands against this defendant.

At the time of the filing of the complaint herein the defendant P. C. Wright had commenced a suit to foreclose his own and some thirty-four assigned liens for labor performed in cutting logs and manufactur-

ing lumber for the defendant company. By stipulation the complaint of Wright was made his answer in the suit of this plaintiff, wherein he pleads that between May 1 and June 5, 1918, at the instance and request of the defendant company he performed work, labor and service upon and assisted in obtaining sawlogs, spars, piling and other timber for it, and performed labor upon and assisted in manufacturing the same into lumber, which is that described in the plaintiff's complaint; that his services were of the reasonable value of $209.50, and that to protect and preserve his lien, on June 8, 1918, he filed with the county clerk of Union County a claim containing a statement of his demand, which was recorded on page 74 of Book E, Records of Liens, and of which a copy is attached to his pleading as exhibit "1." His second cause of suit is a similar claim of one J. C. Gilmore. Then follow twenty-one like causes of suit, representing liens for labor on both lumber and timber, all of which were assigned to Wright.

For a separate cause of suit, Wright alleges that between the dates last above mentioned, one Harry Proctor performed work, labor and services upon and assisted in manufacturing said logs and other timber into lumber, for which he filed his lien on June 8, 1918, a copy of which is attached to the pleading and marked "exhibit 24." Like allegations are made as to eleven further causes of suit, all of which are assigned to the defendant Wright, who as plaintiff in his suit prayed for a decree for the sale of the logs and lumber, the application of the proceeds thereof on the payment of the labor liens, and that all of such liens be declared prior in time and right to the claims of the plaintiff and to all other demands against the defendant company.

To this answer the plaintiff filed a general denial of all material allegations and as a reply alleged the execution of the bills of sale described in this complaint; that all of the 761,000 feet of lumber had been manufactured at the mill and millyards of the defendant company on the Haggerty site and prior to the filing of such liens had been removed from the said millyards where manufactured and hauled to and piled in the lumber-yards at Union, a distance of ten or twelve miles; that "none of the labor or assistance in logging or in manufacturing the logs into lumber, for which the plaintiff claims a lien in this case in his several causes of suit, was labor or assistance in the logging or manufacturing of said logs into the 761,000 feet of lumber now upon the lumber-yards at Union, Oregon," covered by the bills of sale to the plaintiff and then in its possession in the said yards; and that such lumber "was not lienable or subject to lien in favor of the laborers for the work and labor performed by them or their assistance rendered between the first day of May, 1918, and the fifth day of June, 1918, or any part thereof." The plaintiff then disclaims any right or interest in the 400,000 feet of sawlogs or the 75,000 feet of lumber located on the Railroad site, then the millyard of the defendant company, or the 300,000 feet of lumber in the yard at the Haggerty place.

Upon petition of P. C. Wright and order of the court, La Grande National Bank of La Grande, Oregon, was made a defendant, and filed its answer alleging that on April 9, 1918, it loaned to the defendant company $1,400 and took therefor its note payable in ninety days, and that to secure the payment thereof the defendant company executed to that bank its bill of sale of 200,000 feet of lumber then on its yards at

the Haggerty site, which instrument was recorded in the office of the county clerk of Union County in Book C, page 186, Record of Bills of Sale, on April 10, 1918. It also alleges that the bill of sale specified that the defendant company would not "waste or destroy the lumber above mentioned, nor suffer it nor any part thereof to be attached on mesne process"; but that the defendant company has allowed the lumber in question to be attached and the alleged liens to be filed thereon; that the bill of sale was intended to be and was in fact a chattel mortgage and was a first and prior lien on the 200,000 feet of lumber therein described; that none of the labor liens represented claims for work or labor performed in obtaining the logs from which the lumber in question was sawed or manufactured; that all of such labor was performed long subsequent to the manufacture of that lumber, and that the same was not lienable therefor. This bank prayed for a decree for the amount of its note, to foreclose its bill of sale as a chattel mortgage, for the sale of the 200,000 feet of lumber described therein and the application of the proceeds to the payment of its claim.

As a reply, the defendant Wright made a general denial of all of the material allegations of the answer of the La Grande Bank.

On July 8, 1918, the defendant company was adjudicated to be bankrupt by the United States District Court for the State of Oregon, George F. Hall was appointed trustee and on petition and order of the court he was made a defendant here. On August 29, 1918, he filed his answer, denying all of the material averments of either of the banks or the lien claimants and alleging affirmatively that he was in possession "of all of the assets and property" of the defendant

company and was "preserving said property and administering the same subject to the orders of said court of bankruptcy." He prayed for a decree that he be entitled to such possession, "to dispose of the said property and to distribute the same among the creditors of the said" bankrupt company.

The defendants Stonedahl and Davis were attaching creditors whose lien in legal effect was dissolved by the adjudication of bankruptcy, and for such reason made no defense.

For the purpose of trial, the cases in which P. C. Wright and the Union Bank were plaintiffs were consolidated, and they will be so treated in this opinion.

The trial court made findings of fact and conclusions of law and rendered a decree in favor of the Union Bank for the full amount of its claim; that its bills of sale were in effect chattel mortgages; directing that the 700,000 feet of lumber then on the yards of the defendant company at Union be sold and the proceeds first applied to the payment of its claim; that this was a first and prior lien on the lumber; that the alleged liens of P. C. Wright and his assignors for labor were null and void, and that the rights of the trustee, Hall, to any property of the company were subject to the lien of the Union Bank.

A like decree was entered in favor of the La Grande Bank, directing the sale of the 200,000 feet of lumber on the Haggerty site and the application of the proceeds to the satisfaction of its claim.

An appeal was taken by the defendant Wright and the defendant Hall as trustee, both claiming that neither of the banks was entitled to any lien, the defendant Wright contending that he should have a prior lien for the full amount of the claims for labor, and the trustee insisting that all liens against the lum-

ber were null and void and that he was entitled to possession of all of the property as trustee for the use and benefit of the creditors of the bankrupt company.

The first transaction between the Union Bank and the defendant company is evidenced by two promissory notes and a written instrument, in form a bill of sale and in substance a chattel mortgage, which contains the following provisions:

"That if the grantors, their executors, administrators or assigns, shall pay unto the grantee or its assigns, the sum of ($3,125.00) Thirty One Hundred Twenty Five and no/100 Dollars in six months from this date, with interest semi-annually at the rate of 8% per annum, and, until such payment, shall not waste or destroy the lumber above mentioned, nor suffer it, nor any part thereof, to be attached on mesne process (labor liens, etc.,) and shall not, except with the consent in writing of the grantee or its assigns, attempt to remove the same or sell the same, then this deed as also the note of even date herewith, signed by the said Western White Pine Lumber Company; whereby the said Western White Pine Lumber Company promises to pay to the grantee, or order, the said sum and interest at the time aforesaid, shall become null and void.

"But upon any default in the performance of the foregoing conditions, the said Western White Pine Lumber Company does hereby grant, bargain, sell and convey unto the said First National Bank of Union, Union, Oregon, the foregoing described chattels."

This was followed by the remaining notes and written instrument above described, which were never filed, indexed or recorded as chattel mortgages and all of which in legal effect contained the above provisions. From an inspection of the first instrument it is apparent that except as to amount, date and descriptions, the alleged chattel mortgage to the La Grande Bank

was copied from a like instrument previously executed and delivered by the defendant company to the Union Bank. Each note was for the amount of money which the bank then loaned and paid over to the defendant company. At the trial the alleged chattel mortgages were received in evidence over objection of counsel for the trustee, upon the ground that they ''were filed and recorded as bills of sale, and not as chattel mortgages.'' The statute does not provide for the recording of a bill of sale and the record thereof as legal notice is a nullity: *Nicklin* v. *Betts Spring Co.*, 11 Or. 406 (5 Pac. 51, 50 Am. Rep. 477). By Section 7407, L. O. L., it was enacted:

''Every mortgage, deed of trust, conveyance, or instrument of writing intended to operate as a mortgage of personal property, either alone or with real property, hereafter made, which shall not be accompanied with immediate delivery and followed by the actual and continual change of possession of the personal property mortgages, or which shall not be recorded as provided in Section 7405, shall be void as against subsequent purchasers and mortgagees in good faith and for a valuable consideration of the same personal property, or any portion thereof.''

3–5. In *Ayre* v. *Hixson*, 53 Or. 19 (98 Pac. 515, 133 Am. St. Rep. 819, Ann. Cas. 1913E, 659), it is held that a chattel mortgage does not transfer title, but merely creates a lien. The right to possession remains in the mortgagor until there is a breach of the conditions, after which the mortgagee has the qualified title, giving him possession: *Swank* v. *Elwert*, 55 Or. 487–495 (105 Pac. 901). Upon the face of the instruments it appears that they were intended to be chattel mortgages to secure the respective claims of the banks upon the property therein described, and without record they were valid as such between the parties.

As to the Union Bank the testimony is conclusive that it took actual possession of the lumber described in its "bills of sale" on June 3, 1918, and has been in such possession ever since.   This assertion of ownership was followed by its suit in the Circuit Court of Union County to foreclose its "bills of sale" as chattel mortgages, wherein the court had jurisdiction of the subject matter and of the parties thereto, and constructive possession of the lumber described in the bills of sale and the labor liens.

All of the money evidenced by the notes to the banks was then actually loaned to the defendant company and by it used in the payment of labor, in particular, and current monthly expenses.   In fact, the labor account was paid in full from January 1 to May 1, 1918, with the money obtained from the banks.   There is no proof or allegation that either of the banks knew at the time the respective loans were made that the defendant company was insolvent or that either of the loans was not bankable, or that there was any fraudulent motive or intent in the failure or neglect to have the instruments filed and indexed as chattel mortgages.   Nor is there any evidence that either of the banks was not acting in good faith in all of its transactions with the defendant company.   There is no allegation that any creditor of the defendant company was misled or deceived, or was induced to extend credit by reason of the failure to have the "bills of sale" recorded as chattel mortgages.

The petition in bankruptcy was filed by the defendant company and it was adjudged a bankrupt on July 8, 1918.   Hence, at the time of the adjudication there was pending in the Circuit Court of Union County the suit of the Union Bank to foreclose its liens as chattel mortgages, and that bank had been

in actual possession of the lumber at the Union yards from and after June 3, 1918.

6. Under the 1910 amendment (Act June 25, 1910, c. 412, Section 8, 36 Stat. 840 [U. S. Comp. Stats., § 9631]) of the bankruptcy act (July 1, 1898, c. 541, § 47, 30 Stat. 557), as construed by numerous decisions of the federal courts, "a trustee in bankruptcy as against the rights of a chattel mortgagee under an unfiled chattel mortgage, stands in the position of an attaching creditor," and "the rights of a trustee in bankruptcy as against a mortgagee under an unfiled chattel mortgage are determined as of the date the petition in bankruptcy was filed": *Lake View State Bank* v. *Jones, Trustee,* 40 Am. Bankr. Rep. 148, 242 Fed. 821, 155 C. C. A. 409.

"A bill of sale, executed by the bankrupts in order to avoid the sacrifice likely to result from a sale under execution, which had been advertised and intended as security for the debt due, is a chattel mortgage and void as against the trustee in bankruptcy of the judgment debtor, unless filed for record or unless possession was taken by the mortgagee prior to the date of the filing of the petition in bankruptcy upon which adjudication was eventually had.

"A trustee in bankruptcy, since the amendment of 1910 to Section 47a (2) of the Bankruptcy Act, now stands in the relation of a creditor having obtained a lien by levy of an attachment or execution as and of the date of filing of the petition in bankruptcy": *Matter of Schilling and Loller,* 41 Am. Bankr. Rep. 698.

"Where conditional contracts were filed for record before the filing of a petition in bankruptcy, the trustee in bankruptcy acquired no rights greater than those which would be acquired by creditors who on the day that the petition in bankruptcy was filed secured a lien by attachment or otherwise.

"The rights of a trustee in bankruptcy vest as of the date of the filing of the petition in bankruptcy.

"A mortgage, executed more than four months before the bankruptcy petition is filed, is valid as against the trustee, even though the same is not recorded until three days previous to the filing of the petition in bankruptcy, where there is no claim of preference": *Emerson-Brantingham Co.* v. *Lawson, Trustee* (D. C.), 38 Am. Bankr. Rep. 344, 237 Fed. 877.

In construing the 1910 amendment of the bankruptcy act, Black on Bankruptcy (1914 ed.), Sections 365 and 366, says:

"The trustee is no longer in the situation of a general creditor, but occupies the more favorable position of a judgment or execution creditor, and can resist the enforcement of any lien which would be invalid as against a creditor of that class.

"As to recording, the rule appears to be well established that a mortgage which was valid when executed and entirely free from fraud is not invalidated in the bankruptcy proceedings simply because it was not placed on the record until after the debtor had become insolvent or until shortly before the filing of the petition in bankruptcy, provided it is not shown that there was any fraudulent purpose in so withholding it from the record, and if the law of the state is such that recording is not necessary to its validity as between the parties."

In Collier on Bankruptcy (11 ed.), page 729, it is said:

"The class of cases, unprovided for by the original act, and intended to be reached by the amendment, was that in which no creditors had acquired liens by legal or equitable proceedings and to vest in the trustee for the interest of all creditors the potential rights of creditors potential with such liens."

By Judge Witmer, in *In re Hartdagen* (D. C.), 189 Fed. 546, 549, it is held:

"This provision of the bankruptcy act puts the trustee, in so far as the assets of the estate are concerned, in the position of a lien creditor."

—distinguishing the case of *York Mfg. Co.* v. *Cassell,* 201 U. S. 344 (50 L. Ed. 782, 26 Sup. Ct. Rep. 481, see, also, Rose's U. S. Notes), and similar cases.

Jones on Chattel Mortgages (4 ed.), Section 178, says in part:

"Delivery of possession under a mortgage, before rights have been acquired by others, will cure any invalidity there may be in the instrument, whether arising from an insufficient description of the property, an insufficient execution of the instrument, the omission to record it, or from its containing a provision which makes it void except as between the parties; as, for instance, an agreement that the mortgagor may retain possession and sell a stock of goods in the usual course of trade."

This excerpt is quoted with approval in *Kenney* v. *Hurlburt,* 88 Or. 688–700 (172 Pac. 490, 173 Pac. 158, Ann. Cas. 1918E, 737, L. R. A. 1918E, 652).

Loveland on Bankruptcy, volume 1, Section 444, page 922, states that:

"The taking possession by a mortgagee under a chattel mortgage or conditional sale is equivalent to recording."

7. We hold that the Union Bank had a valid chattel mortgage lien, and that as to it the decree of the Circuit Court should be affirmed.

The claim of the La Grande Bank presents a more serious question. Its attorneys state in their briefs and the trial court found that the bill of sale given it by the defendant company was indexed as a chattel

mortgage.   If that were true, a much stronger case would be presented, but we have searched the record in vain for any evidence that would show or tend to show that its bill of sale was ever indexed by the county clerk as a chattel mortgage.

On June 26, 1918, P. C. Wright, as plaintiff in his suit, filed a motion based upon an affidavit of one of his attorneys for an order of court that the La Grande Bank be made a defendant.   The order was made and that bank filed its answer, from which it appears:

"That in order to secure the payment of the said promissory note, principal and interest, in accordance with the tenor and purport thereof, the said defendant Western White Pine Lumber Company then and there made, executed and delivered, to the said defendant La Grande National Bank, a bill of sale of two hundred thousand (200,000) feet board measure, of pine, fir and tamarack lumber. * *

"That said bill of sale, although absolute upon its face, was intended to be and was in fact a chattel mortgage to secure the payment of said sum of $1,400 evidenced by said promissory note."

To this pleading P. C. Wright filed his reply on July 5, 1918.   Hence at the time of the bankruptcy adjudication, beside the suit of the Union bank there was pending the suit of Wright, in which he claimed liens for a large number of laborers for the cutting of logs and the manufacture of lumber.

In the Wright suit an affidavit was then of record from which it appeared that the La Grande bank "has or claims to have a lien or interest in the property mentioned in the complaint," and that the bank named "has or claims to have some lien by way of mortgage on certain of the property described in the complaint, and is therefore a necessary party defendant in this case."   The La Grande bank had then filed its answer, setting forth in full detail all its dealings with the de-

fendant company, the execution of the bill of sale, the facts tending to show that the instrument was a chattel mortgage, and the nature and extent of its claim, all of which was a matter of record in the pending suits at the time of the bankrupt adjudication.

From an examination of the record it will be found that the labor liens were all duly filed in the office of the county clerk of Union County on or about June 8, 1918, and were then a matter of record. In addition to this it appeared from the debtor's bankrupt petition, attached as an exhibit and made a part thereof under the heading, "Creditors holding securities," the following:

"Particulars of securities held, with dates of same, and when they were given, to be stated under the names of the several creditors, and also particulars concerning each debt, as required by acts of Congress relating to bankruptcy, and whether contracted as partners or joint contractor with any other person, and if so with whom."

Each note of the Union bank is then listed and described, together with that held by the La Grande bank, and the statement shows that each note was "attempted to be secured by a bill of sale which holder is attempting to have declared a chattel mortgage."

In Remington on Bankruptcy (2 ed.), Section 1270, with reference to the 1910 amendment of the bankruptcy act, the author lays down the rule that:

"The trustee, as to all property in the custody or coming into the custody of the bankruptcy court, is, in addition to his other rights, to be deemed vested with all the rights, remedies and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also as to all property not in the custody of the bankruptcy court is to be deemed vested with all the rights, remedies and powers of a judgment creditor holding an execution duly returned unsatisfied."

Assuming that Hall, as trustee, actually had the custody of the 200,000 feet of lumber on the Haggerty site, on which the La Grande bank claimed a chattel mortgage lien, and that as such trustee on July 8, 1918, he had all the rights of a lien creditor, he then legally knew that laborers' liens had been duly filed on that lumber and were then a matter of record in the office of the county clerk, and a further search would have disclosed the fact that a suit was then pending to foreclose those liens, wherein the La Grande bank had been made a party defendant because of its claim of lien and had filed its answer, fully setting forth the nature and extent of its claim and its right to such lien, and praying for affirmative relief. It also appeared upon the face of the petition by which the defendant company was adjudicated bankrupt and Hall was elected trustee that each bank had or claimed to have a chattel mortgage lien upon the lumber in controversy. All of such facts existed and were a matter of record at the time of the adjudication on July 8, 1918, when Hall acquired his title as trustee.

In the case of *Posson* v. *Guaranty Loan Assn.*, 44 Or. 106 (74 Pac. 923), this court held:

"It is now settled that the assignment or transfer by a defendant of his interest in the subject matter of the litigation during its pendency does not defeat the suit, but that his purchaser is bound by any judgment or decree that may be rendered therein. * * An assignee who acquires title to the subject matter of the litigation after the filing of the complaint takes *pendente lite,* and is bound by the proceedings against his assignor."

8. Under the facts disclosed by the record, we hold that when the bankrupt adjudication was made and Hall was elected trustee, he legally knew of the existence of the written instrument held by the La Grande

bank, in form a bill of sale and in substance a chattel mortgage, and that it was intended to be a chattel mortgage to secure the $1,400 note of the defendant company owned by that bank.

9. While the Circuit Court allowed the La Grande bank $150 as attorneys' fees, there is no provision in either note or alleged chattel mortgage for the payment of any such fees. The amount is reasonable, but no attorneys' fees should have been allowed, and that was error. The decree of the Circuit Court as to the La Grande bank is modified in regard to the allowance of attorneys' fees, and in all other respects is affirmed.

As to the labor liens, it appears that the defendant operated its mill and cut all of its lumber at the Haggerty site until about May 1, 1918, and that during that month about 450,000 feet of lumber there cut was hauled to the defendant company's yards at Union. About May 1st the defendant company moved its mill from the Haggerty site to what is known as the Railroad site, and at the time the laborers' liens were filed there was about 75,000 feet of lumber in that yard. The Haggerty site is on Catherine Creek, at least twelve miles from the defendant company's yard at Union, and the Railroad site is about one mile from the Haggerty place. No lumber was ever cut or manufactured in the company's yards at Union, and any placed there was hauled at least twelve miles from the Haggerty site, at which the sawmill was first located and the logs were manufactured into lumber.

There is no dispute as to the amount of the liens for labor and it appears that the men were paid in full for their work up to May 1, 1918, but that within a short time after the Union bank took possession of the lumber in the Union yards, under its claims, the laborers

prepared their respective liens and duly filed them of record on and after June 8, 1918.

Section 7461, L. O. L., is as follows:

"Every person performing labor upon or who shall assist in obtaining or securing sawlogs, spars, piles, or other timber, has a lien upon the same for the work or labor done upon or in obtaining or securing the same, whether such work or labor was done at the instance of the owner of the same or his agent. The cook in a logging camp, and any and all others who may assist in or about a logging camp, shall be regarded as a person who assists in obtaining or securing the sawlogs, spars, piles, or other timber herein mentioned."

And Section 7462, L. O. L., provides:

"Every person performing labor upon, or who shall assist in manufacturing sawlogs or other timber into lumber, has a lien upon such lumber while the same remains at the yard wherein manufactured, whether such work or labor was done at the instance of the owner of such lumber or his agent."

It is shown that twenty-four of the liens were "filed for labor performed upon and assistance rendered in cutting and manufacturing said logs and lumber." The remaining liens are for work and labor performed "in manufacturing said lumber now on the mill sites." It is contended that the lumber liens are void as to the lumber in the Union yards. Section 7462 gives the laborers "a lien upon such lumber while the same remains at the yard wherein manufactured." The defendant company never had a sawmill or manufactured any lumber at or in its Union yards, and any lumber lying there was hauled a distance of at least twelve miles from the yards where it had been manufactured. The lienholders contend that the lumber was hauled to the Union yards for the purpose of cutting the ends and

trimming it ready for market. But the fact remains that none of the lumber was ever cut or trimmed there and that the company did not have any machinery actually installed or prepared to do that work at the Union yards. It is significant that the only lumber which was actually sold and shipped was removed from Union to La Grande for the purpose of having it edged and trimmed there.

10–12. The right to a laborer's lien is statutory and in the absence of a specific law such a right would not exist. The law gives a lien upon lumber only "while the same remains at the yard wherein manufactured." After the lumber is removed from the "yard wherein manufactured," the right to file a lien is lost. Although it is true that the lien statute is remedial and should be liberally construed in favor of a lien for such labor, yet we do not know of any legal principle, and counsel have cited no authority, which would sustain a laborer's lien upon lumber which had been hauled twelve miles from the yard "wherein manufactured."

By Section 7464, L. O. L., it was enacted that:

"The liens provided for in this act are preferred liens, and are prior to any and all other liens, and no sale, transfer, mortgage or assignment of any sawlogs, spars, piles or other timber or manufactured lumber, shall divert the lien thereon as herein provided. * * *"

Section 7465, L. O. L., is as follows:

"The person rendering the service or doing the work or labor named in Sections 7461 and 7462 is only entitled to the liens as provided herein for services, work, or labor, for the period of six months, or any part thereof next preceding the filing of the claims as provided in Section 7467."

Section 7466, L. O. L., provides:

"The person granting the privilege mentioned in Section 7463 is only entitled to the lien as provided therein for sawlogs, spars, piles and other timber cut during the six months next preceding the filing of the claim as provided in Section 7467."

Section 7467, L. O. L., is in part as follows:

"Every person, within thirty days after the close of the rendition of the services, or after the close of the work or labor mentioned in Sections 7461 and 7462, claiming the benefit hereof, must file for record with the county clerk of the county in which such sawlogs, spars, piles, or other timber was cut, or in which such lumber was manufactured, a claim containing a statement of his demands and the amount thereof, * * and it shall also contain a description of the property to be charged with the lien, sufficient for identification with reasonable certainty."

There are twenty-four claimants who filed liens "for labor performed upon and assistance rendered in cutting and manufacturing said logs and lumber" and who state in their liens that they "performed such labor upon and assisted in cutting and manufacturing said logs and lumber for the period of —— days." There is nothing in the liens or in the proof which tends to show or from which this court can determine how many days' labor was performed by either of them in the cutting of logs or in the manufacture of lumber. Mr. Wright, who was superintendent of the defendant company, testified that no separate account of such labor was kept. He says that the men were transferred from one employment to another and some of them worked different days in cutting the logs and in manufacturing the lumber, and that there was no way by which it could be ascertained how many days any particular employee worked in cutting logs or in manufacturing lumber. For such reason no separate

liens could be filed and the amount of labor in the cutting of logs could not be segregated from that performed in the manufacture of lumber.

13. While Sections 7461 and 7462, L. O. L., are parts of the same act, they are separate and distinct from each other. The former section gives a lien to the logger, the latter provides for a lien for the manufacture of lumber. Each is complete within itself, as to the right of lien. One section gives a lien upon logs which may have been cut, and the other upon the manufactured lumber, so long as the same remains "at the yard wherein manufactured." Logs are cut in the timber and removed to the mill, where they are manufactured into lumber, which is then piled in the yards. As held by this court in *Day* v. *Green,* 63 Or. 293–295 (127 Pac. 772, 773):

"The two sections were intended to meet different classes of cases, the one for security to the logger, and the other to the operators in the mill."

14. Under Section 7467, L. O. L., it is the duty of the lien claimant to file "a claim containing a statement of his demand." Assuming, without deciding, that he could make and enforce a joint or dual lien for services under Sections 7461 and 7462, it would still be the duty of the lien claimant in his statement to specify the amount and value of his labor for cutting logs and the amount and value thereof in manufacturing lumber.

15. While it is true, and this court has held, that a logger has a lien not only upon the logs which he cuts, but upon the lumber manufactured therefrom, so long as it can be followed and identified: *Schultz* v. *Shively,* 72 Or. 450 (143 Pac. 1115), it must be conceded that a laborer who has a lien for his services in the manufacture of lumber does not have and could not enforce

a lien therefor upon sawlogs before the same are cut into lumber. Although a logger may pursue and enforce his particular lien upon lumber manufactured from the logs upon which he has performed labor, so long as he can follow and identify it, the lien to the laborer for manufacturing lumber is confined and limited to the lumber "while the same remains at the yard wherein manufactured." Counsel have not cited and we have not found any authority which would give a laborer the right to a dual or unsegregated lien for his labor on both logs and lumber under Sections 7461 and 7462; and in the absence of both allegation and proof as to the amount of labor in cutting the logs, as distinguished from that used in the manufacture of lumber, we hold that such liens are void.

The record shows that the following lien claimants, for their respective amount, filed liens for labor in the manufacture of lumber only:

| | |
|---|---:|
| J. P. Sayer | $ 55.02 |
| L. F. Ingram | 31.23 |
| John Julian | 99.50 |
| Albert Stocker | 107.54 |
| C. H. Gibson | 99.00 |
| W. H. Horn | 104.00 |
| E. A. Hardman | 107.50 |
| John Brown | 35.33 |
| Fred Peterson | 57.25 |
| James Davis | 65.67 |
| V. C. Addelman | 118.50 |
| Harry Proctor | 23.00 |
| Henry Cooley | 299.25 |
| Clifford Horstman | 113.75 |

16. While such claims are on all of the lumber at the mill yard on the Haggerty site, they are also upon the 75,000 feet of lumber then in the yard on the Railroad site. The evidence shows that the laborers were

paid in full to May 1, 1918, at which time the sawmill was moved from the Haggerty to the Railroad site, and all of the labor covered by the amounts of the respective liens must have been performed in the manufacture of the 75,000 feet of lumber then at the Railroad site. While these claimants would not have any lien on the lumber at the Union yard or at the Haggerty site, they would have a right to liens upon the lumber at the Railroad site which they had there manufactured after the removal of the plant on May 1st. The labor for which they filed liens must have been performed in the manufacture of lumber which was in the yard at the Railroad site at the time of filing their claims. This renders their respective liens definite and certain as to the amount of their claims, and when and where the labor was performed, conclusively shows that it was performed in the manufacture of the 75,000 feet of lumber on the Railroad site, and clearly brings the claims within the law laid down by this court in *Alderson* v. *Lee,* 52 Or. 92, 96 (96 Pac. 234, 236), where it is held:

"The lumber upon which the liens are sought is in fact segregated, and the claims for labor, as allowed by the Circuit Court, each clearly specify the character of the labor and contract price therefor, and come within the provisions of the statute covering the character of labor designated therein. The lienable lumber is at the mill, and the part not subject to liens is at the railroad track, about one mile distant; and the reference to the latter in the lien notices is mere surplusage, as much so as if it had referred to cattle or horses belonging to the Lee Bros. Co., ranging in the vicinity."

As to the lumber liens, the decree will be modified, sustaining the respective claims on the 75,000 feet of lumber only, at the Railroad site of the defendant company.

17. Attorney Ivanhoe testified that $500 would be a reasonable attorney's fee for the foreclosure of all of the labor liens. That is the only evidence on the subject in the record. Based upon that testimony we hold the view that $250 would be a reasonable attorney's fee to be allowed for the foreclosure of the fourteen liens above described.

A decree will be entered here affirming the decree of the Circuit Court as to the Union bank and as to the La Grande bank, except the allowance of $150 as attorney's fee there, which was erroneous, and in favor of P. C. Wright for the fourteen liens for labor on lumber only, on the 75,000 feet of lumber on the Railroad site, together with $250 as attorney's fees for the foreclosure of the same. In all other respects the decree of the Circuit Court is affirmed, neither party to recover costs in either court.    Modified and Affirmed.

Bennett, J., concurs in the result.

BEAN, J., Concurring in Part and Dissenting in Part. I concur in the able opinion of Mr. Justice Johns, except as to that part relating to the segregating of the items of labor for which liens are claimed. It is held that it is "the duty of the lien claimant in his statement to specify the amount and value of his labor for cutting logs and the amount and value thereof in manufacturing lumber." The statute creating the lien makes no such requirement. The act of 1891, of which Sections 7461 and 7462, L. O. L., are a part, contemplates that but one notice of lien shall be filed for work performed on logs and for labor done in sawing the same. This is clear from a careful reading of Section 7467, L. O. L., providing for the notice of lien. When one man or ten men should be engaged for three or four days in securing logs and immediately thereafter

should labor in sawing the same at a mill, it cannot be suggested that any good' would be obtained in specifying how much time was consumed in logging and how much in work in the mill. A requirement that such should be done in proving a lien is highly technical and not a carrying out of the legislative intent. In *Robins* v. *Paulson,* 30 Wash. 459 (70 Pac. 1113), it was said by Mr. Justice Dunbar that:

"The actual sawing of the timber is no more a part of manufacturing the same than the cutting and preparing of such timber for the saw. In one case the manufactured product of the laborer would be the log; in the other, the manufactured product would be the lumber. We therefore hold that in this case the respondent was entitled to his lien on the lumber."

The Washington statute is, as I understand, practically identical with ours as to the creation of such a lien.

It is well settled in this state that a laborer performing work in assisting in the securing of logs to be manufactured into lumber is entitled to a lien therefor on the lumber after the same is manufactured: Jones on Liens (3 ed.), § 703 et seq.; *Fischer* v. *Cone Lumber Co.,* 49 Or. 277, 283 (89 Pac. 737). The notice of lien therefor may be filed after the logs are sawed. Lien statutes are remedial and should be so construed and enforced so as to carry out the intent of lawmakers: *Day* v. *Green,* 63 Or. 293 (127 Pac. 772). To require the items of labor on the logs and the work in manufacturing the same into lumber to be segregated would only render it necessary for the court to add the amounts together again and render a decree therefor without protecting or changing the rights of any interested party in the least.

I therefore withhold my assent to that part of the opinion holding a part of the lien void.