**In re CHAPPELL et al.**

No. B–29189.

District Court, D. Oregon.
April 28, 1948.

574

Wilber Henderson and Platt, Henderson, Warner, Cram & Dickinson, all of Portland, Or., for The United States Nat. Bank of Portland (Oregon).

Edward A. Boyrie, of Portland, Or., for the trustee.

McCOLLOCH, District Judge.

The opinion of Referee Snedecor is adopted as the opinion of the Court.

In addition to the persuasive reasoning of the learned Referee, it is of great significance that the State Legislature has amended the Trust Receipts Act, O.C.L.A. § 75-101 et seq., to permit trust receipts financing on motor vehicles and aircraft previously purchased, but did not include other types of personal property. Oregon Laws 1947, Ch. 93.

### Opinion of Referee

Upon petition of the trustee an order was issued to The United States National Bank of Portland (Oregon) to show cause, if any, why certain radios and household appliances in the possession of the trustee should not be sold free from any asserted claim of ownership or lien by the bank. The bank countered by a petition to reclaim the articles as the owner "by virtue of certain trust receipts given therefor by Chappell & Vogan" to secure certain advances by the bank.

After a hearing and the introduction of evidence the matter was submitted upon briefs to be filed by counsel.

The relevant facts are undisputed. The partnership firm of Chappell & Vogan, retail dealer in home furnishings, was adjudged a bankrupt upon a voluntary petition filed July 28, 1947. At the time the bankrupt was possessed of certain radios and household appliances upon which the bank held trust receipts.

Under date of October 15, 1946, the bankrupt submitted to the bank a "Dealer's Application for Commodity Floor Plan" which was approved by the bank on the same day. (Trustee's Exhibit 1). This application contemplates execution and delivery by the dealer to the bank of either trust receipts or chattel mortgages to secure advances. Among other things the dealer states in the application: "This plan shall be availed of by our notifying you of drafts drawn on us by the manufacturer or distributor of commodities handled by us, for the cost of such commodities, which drafts you shall pay; or by notifying you of direct deliveries made to us covered by invoices which you shall pay, or by utilizing any other plan which you may designate. This application covers all makes of commodities now or hereafter handled by us. Bills of lading are to be made out to order or to your order."

On November 8, 1946, the bank, as entruster, and Chappell & Vogan, as trustee, signed and filed with the Secretary of State a "Statement of Trust Receipt Financing" in which the bank stated it was, or expected to be "engaged in financing under trust receipt transactions the acquisition by the trustee" of goods described as electrical household appliances, commercial appliances and radios. (Trustee's Exhibit 2).

Thereafter the bank made advances to the dealer in six (6) different transactions which involve inter alia the articles now in question. In each transaction the bankrupt gave to the bank a bill of sale covering certain merchandise which was then in the possession of the bankrupt and had been purchased by it some time previously from various third parties. At the same time the bankrupt exhibited to the bank an invoice or invoices covering the purchase of the merchandise described in the bill of sale. The bank then advanced to the bankrupt ninety per cent of the invoice price of such merchandise and took the note of the bankrupt in the amount so advanced payable within ninety days. At the same time the bankrupt signed a trust receipt describing the same property listed in the bill of sale, which trust receipt stated that the bankrupt acknowledged receipt from the bank of the merchandise described and agreed to hold the same as trustee for the bank.

At the time the bank made its advance to the bankrupt there was indorsed upon the exhibited invoices the statement, "This invoice paid by the Milwaukie-Powell Branch of the United States National Bank of Portland (Oregon)". However, the monies advanced by the bank on the security of the documents executed were paid over direct to the bankrupt and no attempt was made by the bank to determine how such advances were used by the bankrupt. Some of the invoices were several months old at the time that the bank loaned money on the security of the merchandise described therein, and at least two antedated the date of the signing of the Statement of Trust Receipt Financing. In some instances the merchandise had been paid for by the bankrupt some time before the bank made advances thereon. All of the merchandise had been sold and delivered to the bankrupt on open account and the purchase price of some of it was still unpaid at the time of the bankruptcy. In no instance is there proof of the acquisition of new merchandise by the bankrupt upon receipt of advances by the bank, nor is there any correlation between the advances made by the bank and the payments made by the bankrupt on account of the articles designated in the trust receipts.

The trustee of the estate of the bankrupt contends that these transactions are not the kind contemplated in or protected by the Uniform Trust Receipt Act; that the bills of sale taken by the bankrupt were in reality unrecorded chattel mortgages and that the title to the property passed to the trustee in bankruptcy under Section 70, sub. c, of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. c, without notice of the bank's purported liens.

The Uniform Trust Receipt Act is a perplexing maze of technical phrases wholly incomprehensible without an extensive study of the background and development of the security device known as the trust receipt. To avoid trespassing upon the traditional and well defined fields of such common security devices as the pledge, conditional sale and chattel mortgage, most of the act is devoted to definition, limitation and restriction of the arena in which the new device is to play its part in the world of commerce. The object of the Act is to standardize and protect the trust receipt method of financing the acquisition and resale of goods in their journey from producer to retailer. Vol. V Fordham Law Review 240, 242. Stripped of all technical verbiage a trust receipt has been well defined as "a useful and convenient method of financing commercial transactions by means of which title passes directly from the manufacturer or seller to the banker or lender who as owner delivers the goods to the dealer in whose behalf he is acting secondarily, and to whom title goes ultimately when the primary right of the banker has been satisfied." Hamilton National Bank v. McCallum, 6 Cir., 58 F.2d 912.

In order to constitute a trust receipt transaction under the Oregon Uniform Trust Receipts Law the entruster bank must acquire its security interest prior to or at the same time as delivery is made to the dealer, or delivery must be made under some arrangement whereby the security interest is to be acquired "promptly". Section 75-102, O.C.L.A. In other words, the delivery of the goods to the dealer must stem from an arrangement between the

bank and the dealer for the acquisition of the goods by means of advances from the bank. In commenting on this requirement of the Act J. Francis Ireton stated: "It does not insist upon title in and possession from the entruster, so that source of title and possession is immaterial but this extension of the trust receipt doctrine is limited since the act is carefully drawn to apply to new financing of new acquisitions only, so its use is not permissible in all the usual chattel mortgage or conditional sale transactions." In proceedings of the Section of Corporation, Banking and Mercantile Law of American Bar Association, Cincinnati, Ohio, December 17–18, 1945, Page 112.

No authority is cited in the brief of the bank which holds that a trust receipt may be validly employed under the Uniform Trust Receipts Act to give security upon merchandise owned by the dealer as the result of a prior acquisition. The original California law deviated from the Uniform Trust Receipts Act in adding a clause which specifically permitted the giving of a trust receipt upon merchandise theretofore acquired. The California cases which were decided under the original California law are accordingly not authority under the Uniform Trust Receipts Act. J. Francis Ireton in the article referred to (page 115), points out this situation and the history of the California act as follows:

"In Connecticut, Illinois and Indiana, the uniform act was adopted with a substantial change by the addition of a new sub-paragraph (c) to section 2(1) which permits the use of a trust receipt where goods or documents are already owned by and are in the possession of the trustee. This places goods and documents in these three states on the same footing enjoyed by instruments under section 2(1) (b) and authorizes the use of a trust receipt in the normal chattel mortgage loan transaction between entruster and trustee.

"California in enacting the uniform act, adopted this new and additional sub-paragraph (c) but it was repealed in 1939 to make the California act conform to the uniform act. However, in 1940, California added a new sub-paragraph (d) to section 2(3) to permit the use of a trust receipt in making loans on automobiles owned by a dealer, which would be a normal chattel mortgage transaction, thus accomplishing the same effect as the law in Connecticut, Illinois and Indiana, but restricted to automobiles and automobile dealers. This new law was enacted because a chattel mortgage on a stock of goods for sale is void in California."

It follows from the facts in this case that the transactions between the bankrupt and the bank were not transactions in the acquisition of new goods, but were attempts to give security to the bank in goods previously acquired by the bankrupt. Accordingly, the bills of sale and other instruments must be construed as chattel mortgages.

The Bankruptcy Act gives the trustee the status of an attaching creditor holding a lien upon the property in the possession of the bankrupt at the time of his bankruptcy. Section 70, sub. c. In Oregon an attaching creditor, as against third persons, is deemed to be a purchaser in good faith and for a valuable consideration. Section 7-207, O.C.L.A.

The trustee is given the status of an attaching creditor without notice notwithstanding any statements made by the bankrupt in his schedules or any acts or agreements of the bankrupt. Collier on Bankruptcy, 14th Edition, 70.53; In re Youngs Cornell Utilities, Inc., D.C., 20 F.Supp. 381; In re Holley, D.C., 25 F.2d 979; In re Master Knitting Corporation, 2 Cir., 7 F.2d 11; In re Douglas Lumber Co., D.C., 2 F.2d 985.

In the case of Teshner v. Roome, 106 Or. 382, 210 P. 160, 165, 212 P. 473, Justice McCourt, in discussing the attempt of a creditor to establish a chattel mortgage upon a stock of automobile parts and accessories in the possession of a bankrupt, stated: "This latter transaction did not amount to a chattel mortgage. At most, it was an unexecuted agreement to give a chattel mortgage, and plaintiff did not thereby, or by his suit, acquire any claim or lien upon the stock of parts and accessories, as against the trustee in bank-

ruptcy." Page 398 of 106 Or., page 163 of 210 P. Other pertinent quotations from his opinion are:

"'As against a chattel mortgagee not in possession of the mortgaged property, and whose mortgage is not recorded, the trustee in bankruptcy stands in the position of an attaching creditor, having obtained a lien by levy of an attachment or execution as and of the date the petition in bankruptcy was filed: First Nat. Bank of Union v. Wegener, 94 Or. 318, 334, 181 P. 990, 186 P. 41; Lake View State Bank v. Jones, 242 F. 821, 155 C.C.A. 409, 40 Am.Bankr.Rep. 148.

    \*    \*    \*    \*    \*    \*

"Under the state statutes, a chattel mortgage not accompanied with immediate delivery and actual and continued change of possession of the property mortgaged, or which shall not be recorded, is void as against subsequent purchasers in good faith and for a valuable consideration of the same personal property (Section 10178, Or.L.), and an attaching creditor, from the date of the attachment, is deemed such a purchaser: Section 10180, Or.L."

From the facts and the law the court must conclude that the instruments held by the bank were nothing more than unrecorded chattel mortgages pertaining to property in the possession of the bankrupt at the time of bankruptcy, and that as such they are invalid as against the trustee.

Counsel for the trustee will submit appropriate findings and order.